1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11

12   EDWARDO BALTIERA,              ) 1:10-cv—00590-LJO-SKO-HC
                                    )
13              Petitioner,         ) ORDER SUBSTITUTING CONNIE GIPSON,
                                    ) WARDEN, AS RESPONDENT
14                                  )
        v.                          ) FINDINGS AND RECOMMENDATIONS TO
15                                  ) DECLINE TO CONSIDER NEW CLAIMS
     CONNIE GIPSON, Warden,         ) AND TO DENY THE FIRST AMENDED
16                                  ) PETITION FOR WRIT OF HABEAS
                Respondent.         ) CORPUS (DOC. 14)
17                                  )
     _____) FINDINGS AND RECOMMENDATIONS TO
18                                    DENY PETITIONER'S REQUEST FOR AN
                                      EVIDENTIARY HEARING

19                                    FINDINGS AND RECOMMENDATIONS TO
                                      DIRECT THE ENTRY OF JUDGMENT FOR
20                                    RESPONDENT AND DECLINE TO ISSUE A
                                      CERTIFICATE OF APPEALABILITY
21

22        Petitioner is a state prisoner proceeding pro se and in

23   forma pauperis with a petition pursuant to 28 U.S.C. § 2254.  The

24   matter has been referred to the Magistrate Judge pursuant to 28

25   U.S.C. § 636(b)(1) and Local Rules 302 through 304.  Pending

26   before the Court is the first amended petition (FAP), which was

27   filed on July 13, 2011.  Respondent filed an answer to the FAP

28   with supporting documents on September 7, 2011.  On October 20,

                                    1

2011, Petitioner filed a traverse.

I. <u>Jurisdiction</u>

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997); <u>Furman v. Wood</u>, 190 F.3d 1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. §§ 2254(a), 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7 (2000); <u>Wilson v. Corcoran</u>, 562 U.S. –, –, 131 S.Ct. 13, 16 (2010) (per curiam).  Petitioner claims that in the course of the proceedings resulting in his conviction and sentence, he suffered violations of his constitutional rights.  The challenged judgment was rendered by the Madera County Superior Court (MCSC), which is located within the territorial jurisdiction of this Court.  28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d).

An answer was filed on behalf of Respondent M. McDonald, Warden, who at the time the petition and answer were filed was the warden of the High Desert State Prison at Susanville, California, where Petitioner was incarcerated at the time the petitions were filed.  Petitioner thus named as a respondent a person who had custody of the Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules).  <u>See</u>, <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994).

1    Accordingly, this Court has jurisdiction over the subject

2 matter of this action and over the person of Respondent.

3    II.  Order to Substitute Respondent

4    Fed. R. Civ. P. 25(d) provides that an action does not abate

5 when a public officer who is a party in an official capacity

6 dies, resigns, or otherwise ceases to hold office while the

7 action is pending; rather, the officer's successor is

8 automatically substituted as a party.  The rule further provides

9 that a court may at any time order substitution, but the absence

10 of such an order does not affect the substitution.

11    Petitioner initially named as Respondent Mike McDonald, who

12 at the time the petition was filed was the warden of the High

13 Desert State Prison.  However, Petitioner filed a change of

14 address after the FAP was filed to reflect that his present

15 custodial institution is the California State Prison at Corcoran,

16 California (CSP-COR).  The official website of the California

17 Department of Corrections and Rehabilitation (CDCR) reflects that

18 Connie Gipson is presently acting as the warden of CSP-COR.[1]

19    Accordingly, it is ORDERED that Connie Gipson, Warden, is

20 SUBSTITUTED as Respondent.

21    III.  Procedural Summary

22    In case number MCR017637 in the MCSC, Petitioner was

23 convicted of having committed sexual offenses against his

24 stepdaughters.  As to stepdaughter D, Petitioner was convicted of

25

26    [1] The Court may take judicial notice of facts that are capable of
accurate and ready determination by resort to sources whose accuracy cannot
reasonably be questioned, including undisputed information posted on official
27 websites.  Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331,
333 (9th Cir. 1993); Daniels-Hall v. National Education Association, 629 F.3d
28 992, 999 (9th Cir. 2010).  The address of the official website for the CDCR is
http://www.cdcr.ca.gov.

having committed two counts of aggravated sexual assault in violation of Cal. Pen. Code § 269(a)(1) [counts 1 and 2], and one count of attempted lewd acts in violation of Cal. Pen. Code §§ 664 and 288(a) [count 4]; he was acquitted of a third count of aggravated sexual assault against D [count 3].  As to stepdaughter R, Petitioner was convicted of two counts of forcible lewd acts in violation of Cal. Pen. Code § 288(b) [counts 5 and 6].  The jury also found that Petitioner committed an offense against more than one victim within the meaning of Cal. Pen. Code § 667.61.  The trial court imposed four consecutive terms of fifteen years to life for counts 1, 2, 5, and 6, plus three years for count 4, the attempt conviction. (Ans., doc. 20, 6-7; doc. 20-1, 2, 8.)

Petitioner appealed his conviction to the Court of Appeal of the State of California, Fifth Appellate District (CCA), which remanded the case for re-sentencing on counts 5 and 6 but affirmed the judgment in all other respects.  (LD 1, 27.)[2] Petitioner's petition for review of the CCA's decision was denied by the California Supreme Court (CSC) without a statement of reasons or citation of authority.  (LD 5-6.)  No post-conviction collateral actions were filed in state court.  (Doc. 20, 6:12.)

IV.  <u>Factual Summary</u>

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and

---

[2] "LD" refers to documents lodged by Respondent in support of the answer.

convincing evidence to rebut the presumption of correctness.  28

U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48

(9th Cir. 2004).  This presumption applies to a statement of

facts drawn from a state appellate court's decision.  <u>Moses v.

Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).  The following

statement of facts is taken from the decision of the CCA filed on

September 25, 2008, in <u>People v. Baltierra</u>, case number F052609:

> Defendant was born in March 1974, and married Christi
> in June 2001. The victims, D. and R., were Christi's
> daughters. D. was born in March 1991 and R. was born in
> November 1992. The victims also had two little
> brothers.
>
> In June 2003, defendant, Christi, and the children
> moved in with Daniel Pool (hereafter, "Pool" or "Uncle
> Dan"). Pool lived out in the country, and the children
> called him Uncle Dan. It was during the time they were
> living with Pool that defendant sexually abused the
> victims. At defendant's trial, four witnesses testified
> for the prosecution.
>
> 1. Victim D.
>
> At trial, D. recalled three specific incidents of
> sexual abuse. One night defendant took her into the
> orchards outside Pool's house. He told her they were
> going to shoot rabbits. But once they were there,
> defendant placed D. on the ground and put his finger
> inside her vagina. He then got on top of her and put
> his penis inside her vagina. D. cried and struggled to
> get away but defendant "just kept going." When he was
> done, defendant pulled up D.'s pants and then his own
> before they walked back to the house.
>
> Another night, defendant came into the victims' bedroom
> while they were sleeping. Defendant got on top of D.,
> pulled down her pants, and put his penis inside her
> vagina. D. recalled that R. woke up and defendant told
> her to go back to sleep. D. cried and tried to get
> free, but defendant "just kept going and going until he
> was done." When he was done, defendant pulled up his
> pants and left the room.
>
> The last incident D. could recall took place around
> Thanksgiving. D. testified that she thought it was
> Thanksgiving "Because that morning my uncle put in the
> turkey in the oven." Defendant came to her room and
> gave her a beer to drink. He then touched her and put

his penis inside her vagina.

When asked how many times these encounters with defendant occurred, D. testified, "Whenever he was drinking or smoking pot." Her mother was asleep when they happened.

The first person D. told about what was happening was Uncle Dan. It was Thanksgiving morning. Uncle Dan asked her why she was crying and why defendant had been in her room. D. did not tell anybody sooner because she was scared her mother would not believe her. D. explained her mother "takes the man before her children."

No one besides defendant ever touched D. inappropriately.

D. claimed that defendant physically disciplined her by getting a belt and hitting her on the back. He also did this to one of her brothers.

Even before the first incident of abuse, D. thought defendant was "a nasty man" and "had a feeling something bad was going to happen."

When D. lived in the house with her mother and defendant, defendant spoke Spanish. D. understood and spoke Spanish and was able to communicate with defendant.

On cross-examination, D. confirmed that, during an interview, she estimated that defendant had sex with her 30 to 35 times and that this was true. It would happen every Friday and Saturday night when defendant would get drunk and come into her room. Her mother was always in the house when this happened.

D. also acknowledged that when she was asked during the interview how her mother and defendant met, she said they met when her mother forced her to watch her having sex with 20 men, two at a time. Defendant was one of the 20 men. D. maintained that this was true.

D. further verified that when she was asked during the interview how she knew defendant was done having sex with her during the incident in the orchards, she answered, "he shot his sperm inside me."

Before talking to Uncle Dan, D. never told any school officials about defendant's abuse because she was afraid she and her siblings would be taken away from her mother and Uncle Dan, and she wanted them to stay together.

D. admitted she wanted defendant out of her life and her family's life from the time she met him.

On redirect examination, D. testified she did not dislike defendant so much that she would be willing to lie to get rid of him.

2. Victim R.

At trial, R. recalled that defendant touched her in three different rooms in Uncle Dan's house. The first incident she could recall occurred in defendant's room. Defendant pulled her pants down, laid her on the bed, and started trying to put his penis inside her vagina. R. could not get up because defendant was bigger than she was and he would push her back down on the bed.

The second incident R. could recall occurred in the bathroom. Defendant laid her down on a towel on the bathroom floor and tried to put his penis inside her vagina. His penis went in "[a] little." He stopped when R. heard her uncle asking where she was.

R. recalled that defendant also assaulted her in the living room. R. testified that defendant bent her over the arm of a couch and "did it from behind ... [h]e stuck his [penis] into my vagina."

R. also claimed that one night she witnessed defendant sexually assaulting her sister, D. According to R. defendant came into their bedroom through the window. He went to the bed, pulled down D.'s pants, and stuck his penis inside her. R. told him to stop or she would tell her uncle. He stopped and left the bedroom through the door.

R. never told her mother because her mother would not have believed her, "Because she's like that." R. did not think any of her teachers would believe her either.

R. confirmed that defendant spoke Spanish. She understood it and was able to communicate with defendant when she lived with him.

On cross-examination, R. acknowledged that in August 2004, about eight months after she was placed in foster care, she told a social worker that Pool also molested her and that this was true. According to R., she had tried to tell her teachers, but they had not believed her.

R. confirmed that she told law enforcement officials that her mother met defendant while they were playing basketball at a school.

R. also acknowledged that she told Uncle Dan that defendant molested her. When she talked to Uncle Dan, he told her "almost all Mexicans fuck their own children."

R. acknowledged that when describing defendant's acts to an interviewer, she made statements including, "I put it tight so he doesn't stick it in," "he just stuck the head in," and "Every time he tries to shoot the load in me, he can't."

On redirect examination, R. verified that it was her testimony that both defendant and Pool molested her.

3. Daniel Pool

Pool testified he saw defendant go into D.'s room early one morning. Defendant had two beers with him. When D. came out of the room, Pool asked her what was going on, but she did not say anything. Pool then asked what defendant was doing bringing beers into her room. D. replied that defendant was just talking to her, but Pool could smell beer on her breath. D. eventually disclosed that she was being molested. Pool told D. she needed to tell her mother. Pool was present when D. spoke to her mother, who became upset. Pool then called the sheriff's department and they came out and spoke with D.

Pool denied that he ever threatened defendant. Pool did not speak Spanish and never spoke to defendant. Pool often saw defendant drinking in the house.

Pool recalled that on the occasion he saw defendant go into D.'s room, he was preparing food, including a turkey, for Christmas dinner.

Pool never saw defendant whip any of the children with a belt.

Pool acknowledged that he was aware that R. had in the past accused him of touching her inappropriately. To his knowledge, the allegations were investigated. He did not know what happened with those allegations. The allegations were made sometime before Christi, defendant, and the children moved into his home. Pool was never charged with any crimes.

On cross-examination, Pool testified that he contacted the sheriff's department the same night D. told him about defendant. His recollection was that D. told him on Christmas Eve.

Pool denied that R.'s allegations against him were true. When asked if he said "almost all Mexicans fuck

their own children," Pool responded, "That's a lie, sir." According to Pool, the victims "always had problems of telling stories."

Pool further testified on cross-examination that he was gone a lot, mostly on the weekends, and never witnessed defendant touch D. or R. inappropriately. Pool also denied that he ever physically disciplined D.

On redirect examination, Pool explained that he allowed Christi and her family to live with him despite R.'s prior allegations because they were begging him for a place to stay. Pool was upset the night he called the sheriff's department, "Because it didn't seem like their mother wanted to do anything, and I was so upset that these kinds of things would happen in my house."

4. Detective Hancock

Detective Karl Hancock with the sheriff's department was assigned to the case involving D. and R. He went to Pool's home to investigate their allegations. Detective Hancock described Pool's home and the surrounding area.

On cross-examination, Detective Hancock testified he was present during the separate "C-SART [(Child Sexual Abuse Response Team)]" interviews of D. and R. During her interview, D. did not make any statements about an incident of sexual activity occurring on Thanksgiving. Rather, she indicated it was Christmas Eve. Detective Hancock confirmed that D. stated defendant met her mother when her mother forced D. to watch her have sex with 20 men. D. also reported that she had around 30 sexual encounters with defendant. In her interview, R. stated that defendant had or attempted to have sex with her about 20 times. During their interviews, neither D. nor R. mentioned she was molested by Daniel Pool.

Detective Hancock further testified that Pool reported defendant for the first time to the sheriff's department on January 24, 2004.

The Defense

With the aid of a Spanish interpreter, defendant testified and denied that he ever had sex or attempted to have sex with D. or R.

Defendant further testified he had lived in the United States for 12 years. He never had group sex with his wife, and D.'s testimony that he and 19 other men had sex with his wife was false.

Defendant testified that a few weeks before defendant was arrested, Pool threatened him and said "he's going

to find the way to fuck me up."

On cross-examination, defendant testified he met Christi and her two daughters for the first time when he was on the street running errands. Defendant and Christi married a year later. He communicated with Christi in Spanish.

Defendant further testified that Pool threatened him around November 2003, and that he moved out of the house two to three weeks later. Defendant denied that he ever disciplined the victims.

Chris Swearengin testified that he was Pool's biological son. He sometimes visited Pool at his residence when Christi's family was living with him. During his visits, he saw Pool physically disciplining R. When asked in what manner Pool disciplined R., Swearengin replied: "Spanked 'em with his bare palm."

V.  Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. Cullen v. Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362, 412 (2000).

///

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. at 405-06. The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." Early v. Packer, 537 U.S. 3, 8 (2002).

A state court unreasonably applies clearly established federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in an objectively unreasonable manner, or 2) extends or fails to extend a clearly established legal principle to a new context in an objectively unreasonable manner. Hernandez v. Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.

An application of clearly established federal law is unreasonable only if it is objectively unreasonable; an incorrect or inaccurate application is not necessarily unreasonable. Williams, 529 U.S. at 410. A state court's determination that a claim lacks merit precludes federal habeas relief as long as fairminded jurists could disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. Id. To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing

11

law beyond any possibility for fairminded disagreement." Id. at 786-87.  The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof.  Cullen v. Pinholster, 131 S. Ct. at 1398.  Further, habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA.  Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen v. Pinholster, 131 S. Ct. at 1398. Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1).  Id. at 1400.  A state court decision that was on the merits and was based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceedings.  28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

VI.  Consecutive Terms

Petitioner challenges the trial court's imposition of consecutive terms of fifteen years to life for counts 1 and 2, the aggravated sexual assaults of D committed in violation of Cal. Pen. Code § 269.  Petitioner argues that it was improper to sentence him to consecutive sentences because Cal. Pen. Code § 269 was not listed as an offense requiring a mandatory

consecutive sentence pursuant to Cal. Pen. Code § 667.6(d).  (FAP 4, 7-8.)

The CCA addressed Petitioner's claim in its decision on appeal.  (Doc. 20-1, 8-13.)  The CSC denied Petitioner's petition for review summarily.  (LD 5-6.)  Accordingly, the decision of the CCA is the last reasoned decision on the claim.

The CCA began its analysis as follows:

> The trial court imposed 15-year-to-life sentences for each of the two aggravated sexual assault counts (i.e., the § 269 counts), as was required by section 269, subdivision (b). It ordered that those sentences run consecutively under the assumption that consecutive sentences were mandatory under section 667.6, subdivision (d). Defendant argues that consecutive sentences were not mandatory because section 269 is not an offense enumerated in section 667.6, subdivision (d). We disagree with defendant's argument.

(Doc. 20-1, 8.)  The CCA reviewed § 269 and the California cases applying the statute in analogous situations.  (Id. at 9-10.) The CCA considered a 2006 amendment of § 269, which Petitioner argued showed that the Legislature took a contrary view of the pertinent statutes.  The CCA reviewed the terms of the amendment, the legislative history, the broader state statutory scheme, applicable state law principles of statutory construction, and pertinent state case law. (Id. at 10-13.)  The CCA concluded as follows:

> Based on our reasoning in *Jimenez* and *Glass*, we agree with the conclusion that "Section 667.6, subdivision (d) was crystal clear, at the time defendant committed his crimes, in its application to the rapes that the jury in this case found beyond a reasonable doubt to have been committed. Therefore, consecutive sentencing was mandatory under that subdivision." (*Figueroa, supra*, 162 Cal.App.4th at p. 100.)

(Doc. 20-1, 13.)

///

In its analysis of Petitioner's sentencing issue, the CCA was engaging in statutory interpretation and construction of California law.  The CSC endorsed the CCA's construction and application by its summary denial of Petitioner's petition for review.

In a habeas corpus proceeding, this Court is bound by the California Supreme Court's interpretation of California law unless it is determined that the interpretation is untenable or a veiled attempt to avoid review of federal questions.  Murtishaw v. Woodford, 255 F.3d 926, 964 (9th Cir. 2001).  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas corpus.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).

Here, there is no indication in the record that the state court's interpretation was either untenable or a veiled attempt to avoid review of federal questions.  Accordingly, the state court's construction and application of the California sentencing statutes in this case bind this Court.

Petitioner has not shown a basis for relief on his sentencing claim in a proceeding pursuant to 28 U.S.C. § 2254, which remedies only violations of the Constitution, laws, or treaties of the United States.  28 U.S.C. §§ 2254(a), 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. –, –, 131 S.Ct. 13, 16 (2010) (per curiam).  It will, therefore, be recommended that Petitioner's sentencing claim be dismissed.

1   VII.   Ex Post Facto

2       Petitioner argues for the first time in his traverse that

3   his consecutive sentences for aggravated assault constituted a

4   violation of the prohibition against ex post facto laws.  (Doc.

5   24, 6-7.)

6       It is improper to raise substantively new issues or claims

7   in a traverse, and a court may decline to consider such matters.

8   To raise new issues, a petitioner must obtain leave to file an

9   amended petition or additional statement of grounds.  Cacoperdo

10  v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994), cert. den., 514

11  U.S. 1026 (1995).

12      Here, Petitioner did not raise the ex post facto ground in

13  the FAP.[3]  Further, Petitioner has not sought leave of the Court

14  to amend his petition to raise this new issue, and Respondent has

15  not had an opportunity to respond to the claim.

16      Accordingly, it will be recommended that the Court exercise

17  its discretion to decline to consider Petitioner's ex post facto

18

19      [3] For his first ground in the FAP, Petitioner wrote "(See-3A)," which the
    Court understands to be a reference to Petitioner's page 3A, which was added
20  to the petition form as a typed addendum.  (FAP, doc. 14 at 7.)  Reference to
    Petitioner's page 3A (which appears at FAP 5) shows only a continuation of
21  grounds responsive to question 9(d) of the petition form, which appeared on
    page 4 of the FAP and requested information on the grounds raised in an appeal
    of the conviction.  In item 9(d), the first ground Petitioner stated was
22  raised in the appeal was, "Whether the former version of the crime of
    aggravated sexual assault of a child (Pen. Code § 269) was subject to
23  mandatory consecutive sentencing (PC § 667.6.sub.(d)).  Even though this crime
    was not specified-(See 3A)."  (FAP, doc. 14, 4.)  On page 3A, before the
24  second ground is listed, the words "in section 667.6" appear.  (Id. at 5.)
    For the supporting facts for the claim, Petitioner directed the reader to
25  "(See-5A)."  (FAP 7.)  On page 5A (FAP 8), which is another typed page added
    to the petition, Petitioner stated, "Petitioner Edwardo Baltiera argued on
26  appeal the trial court erred in imposing mandatory consecutive sentences on
    counts 1 and 2 for aggravated sexual assault."  (FAP 8.)  It appears
27  that the first ground Petitioner raises in the FAP is whether a violation of
    Cal. Pen. Code § 269 was subject to mandatory consecutive sentencing even
    though it was not specified in Cal. Pen. Code § 667.6(d).  No mention of an ex
28  post facto claim is made; rather, Petitioner appears to argue a state law
    claim of sentencing error.

15

1  claim.

2      VIII.   <u>Native American Dialect Interpreter</u>

3      Petitioner argues that although he speaks some Spanish, the

4  trial court's failure to inquire to determine whether a Spanish

5  language interpreter was sufficient, when the court was on notice

6  that the defendant's primary language was a Central American

7  Indian language, presents important federal constitutional and

8  state law questions.  (FAP 8.)

9      To the extent that Petitioner relies on state law for his

10  claim regarding an interpreter, Petitioner fails to allege facts

11  that would entitle him to relief in a proceeding pursuant to

12  § 2254 because in this proceeding, only violations of the

13  Constitution, laws, or treaties of the United States qualify for

14  relief.  Federal habeas relief is not available to retry a state

15  issue that does not rise to the level of a federal constitutional

16  violation.  <u>Wilson v. Corcoran</u>, 562 U.S. — , 131 S.Ct. 13, 16

17  (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).  Alleged

18  errors in the application of state law are not cognizable in

19  federal habeas corpus.  <u>Souch v. Schaivo</u>, 289 F.3d 616, 623 (9th

20  Cir. 2002); <u>Langford v. Day</u>, 110 F.3d 1380, 1389 (9th Cir. 1996).

21  The Court accepts a state court's interpretation of state law.

22  <u>Id.</u> at 1389.

23      Accordingly, to the extent that Petitioner's claim

24  concerning an interpreter is based on state law, it will be

25  recommended that the claim be dismissed.

26      With respect to Petitioner's claim under the Constitution,

27  the last reasoned state court decision was the decision of the

28  CCA.  The CSC summarily denied review of the claim.  Thus, the

Court will look through the summary denial of the CSC to the CCA's decision.

A. <u>Facts</u>

The facts stated in the CCA's decision are as follows:

IV. Denial of a "Mixtec" Interpreter

> During the proceedings which spanned a period of three years, defendant was aided by a Spanish interpreter. He also testified in Spanish at trial. For the first time at the sentencing hearing in March 2007, defendant's newly retained counsel asserted that defendant did "not understand Spanish" but spoke "Musla Indian." FN4 Defense counsel then asserted the proceedings should not go forward without a "proper interpreter." The prosecutor objected that this was "asinine." The trial court then denied the defense request for an "additional type of interpreter." The court noted that defendant was convicted in August 2006, and that the matter had already been continued numerous times. The court expressed suspicion that defendant's "new sudden" claim for a "new and different type of interpreter" was simply a "ploy" to delay the proceedings further. Defendant now contends the court abused its discretion in denying his request for a new interpreter and failing to conduct a hearing into defendant's asserted need for a "Mixtec" interpreter. We disagree.

>> FN4. On appeal, defendant asserts that "this must be a transcription error or misstatement on the part of counsel; there is no such language as 'Musla,' whereas Mixtec is an Indian language that is commonly spoken by Mexican immigrants in the Central Valley, particularly Madera County, where [defendant] lived and where this case was tried." Defendant supports his assertion regarding the prevalence of the Mixtec language in Madera County with a UC Davis study and New York Times article. Otherwise, the record contains no evidence that defendant spoke the Mixtec language.

(Doc. 20-1, 19-20.)

B. <u>The Decision of the State Court</u>

The CCA based its decision on Cal. Const., art. I, § 4, which expressly provides that a person unable to understand English who is charged with a crime has a right to an interpreter

17

1   throughout the proceedings.  The CCA applied California cases and

2   analyzed whether the Petitioner had established that an

3   interpreter was necessary by showing that his understanding of

4   Spanish was not sufficient to allow him to understand the nature

5   of the proceedings and to participate intelligently in his

6   defense.  It further considered the scope of a trial court's

7   discretion under California case law which would be affirmed

8   unless there was a complete lack of any evidence in the record

9   that the accused did understand Spanish, thereby rendering the

10  decision totally arbitrary.  (Id. at 20-21.)

11      The CCA noted the numerous indicia of Petitioner's knowledge

12  of Spanish contained in the record,[4] characterized the record as

13  not reflecting a complete lack of evidence that defendant

14  understood Spanish, determined that no authority supported a duty

15  on the part of the trial court to make an inquiry under the

16  circumstances, and concluded as follows:

17          Given his demonstrated ability to understand Spanish
            during the majority of the proceedings, the trial court
18          did not abuse its discretion by implicitly concluding
            defendant understood Spanish and did not require a new
19          interpreter. It follows there was no due process
            violation.
20
    (Id. at 21-22.)
21
    ///
22

23

24      [4] The court considered Petitioner's having testified in Spanish at
    trial, Petitioner's having testified that he communicated with his wife in
25  Spanish, testimony by English-speaking witnesses that Petitioner spoke Spanish
    at home and that they understood and were able to communicate with him in
    Spanish, Pool's testimony that Petitioner spoke Spanish, and Petitioner's
26  having undergone a psychological evaluation pursuant to Cal. Pen. Code § 288.1
    which produced a report describing him as "Spanish-speaking only."  (Id. at
27  21.)  The court discounted two isolated instances of confusion that Petitioner
    claimed showed difficulty understanding Spanish but which the trial court
28  found were possibly due to Petitioner's desire to evade an uncomfortable line
    of questioning.  (Id. at n.5.)

18

1        C.   Analysis

2        The United States Supreme Court has recognized that persons

3   who speak languages other than English are protected by the

4   Constitution.  United States v. Si, 333 F.3d 1041, 1043 n.3 (9th

5   Cir. 2003) (citing cases).  Although there is no constitutional

6   right to a court-appointed interpreter, the use of an interpreter

7   is within the discretion of the trial court.  Perovich v. United

8   States, 205 U.S. 86, 91 (1907); United States v. Si, 333 F.3d at

9   1042-43 n.3.  The rule in the Ninth Circuit is as follows:

10          Our circuit holds that a constitutional right to an
            interpreter exists in certain situations. *See* United
11          States v. Mayans, 17 F.3d 1174, 1179-81 (9th Cir.1994)
            (holding that a defendant's Fifth Amendment rights were
12          violated when an interpreter was withdrawn by the
            court); *see also* United States v. Shin, 953 F.2d 559,
13          561 (9th Cir.1992) ("As a constitutional matter, the
            appointment of interpreters is within the district
14          court's discretion.").

15   United States v. Si, 333 F.3d at 1043.

16        Here, the facts as found by the state court reflect that

17   Petitioner proceeded throughout a substantial portion of the

18   trial proceedings with a Spanish language interpreter, including

19   the hearing and giving of testimony, without any apparent

20   difficulty except one instance of confusion concerning the

21   Petitioner's definition of sex during testimony, and Petitioner's

22   expressed inability to understand his right to an appeal when he

23   was receiving advice after his request for a new interpreter was

24   denied.  It was not until sentencing that Petitioner asked for an

25   additional interpreter.  At that time, the trial court reviewed

26   the available information concerning Petitioner's conduct during

27   the trial.  Because the Petitioner had demonstrated his ability

28   to understand Spanish during the majority of the proceedings, the

19

1  CCA concluded that the trial court's implicit conclusions that
2  the Petitioner understood Spanish and did not require an
3  interpreter were within the court's discretion.

4      This conclusion was not contrary to, or an unreasonable
5  application of, clearly established federal law.  There was no
6  indication that Petitioner's ability to comprehend the
7  proceedings, give testimony, or communicate with counsel had been
8  affected.  Thus, there were no circumstances that presented a
9  basis for a finding of a violation of Petitioner's Fifth, Sixth,
10 or Fourteenth Amendment due process rights.  A fairminded jurist
11 could reasonably find that Petitioner's apparent ability to
12 proceed with a Spanish language interpreter throughout the trial
13 proceedings demonstrated an ability to communicate effectively in
14 the Spanish language.  Cf. United States v. Si, 343 F.3d 1116,
15 1122 (9th Cir. 2003).  As long as the defendant's ability to
16 understand the proceedings and communicate with counsel is
17 unimpaired, the appropriate use of interpreters in the courtroom
18 is a matter within the trial court's discretion.  Cf. United
19 States v. Lim, 794 F.2d 469, 471 (9th Cir. 1986).

20     Accordingly, it will be recommended that Petitioner's claim
21 concerning the failure to provide an additional interpreter be
22 denied.

23     IX.  Additional Claims concerning an Interpreter

24     For the first time in his traverse, Petitioner argues in
25 conclusional form that even though he spoke some Spanish, the
26 failure to provide him with an additional interpreter for his
27 native Central American Indian language violated his right to
28 present a complete defense, to be present meaningfully at every

material phase of trial, and to have meaningful access to the courts.  Petitioner also claims that he was denied the right to understand the charges and defend himself.

However, Petitioner does not point to a single indicator of denial of any of those rights or of any related prejudicial effect.  Petitioner has identified no particular part of the proceedings which he did not understand, no evidence that he was unable to comprehend or confront, no instance where he could not testify or communicate with counsel, and no indication of any plea or request that he would have entered had an additional translator been present.  In light of Petitioner's apparent satisfaction and facility with Spanish during his day-to-day living, testimony, and the remainder of the trial proceedings, it does not appear that Petitioner could establish that he suffered any prejudice from the use of a Spanish language interpreter.

A habeas petitioner must allege facts that show that he was prejudiced by an alleged constitutional violation.  Cf., Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (determining that habeas relief is warranted when an error resulted in actual prejudice, or had a substantial and injurious effect or influence in determining the jury's verdict).  Further, Respondent has not had an opportunity to respond to the new claims, and Petitioner does not seek to amend his petition to include the additional claims.

Accordingly, it will be recommended that the Court exercise its discretion to decline to consider Petitioner's new claims.

X.   Denial of a Motion for a New Trial Based on Newly Discovered Evidence

Petitioner argues that the trial court erred in denying a

motion for a new trial after newly discovered evidence revealed

that a principal prosecution witness was a serial child abuser,

which in turn could have explained how the two victims were able

to provide detailed accounts of the facts of sexual abuse.  (FAP

5, 8.)[5]  Petitioner alleges that this poses an important question

of federal constitutional and state law.  (FAP 8.)  However, as

previously noted, to the extent that Petitioner's claims rest on

state law, they are not cognizable in this proceeding as this

Court's scope of review extends only to violations of the

Constitution, laws, or treaties of the United States.

Accordingly, to the extent that Petitioner's claim

concerning the new trial motion rests on state law, it will be

recommended that the claim be dismissed.

A.   The State Court's Decision

The CCA stated the following in its appellate opinion, which

was the last reasoned decision of a state court on the issue:

V. Denial of New Trial Motion

After the jury rendered its verdict and prior to
sentencing, defendant filed a written motion for a new
trial on the ground of newly discovered evidence in the
form of declarations from two women in their thirties
claiming that prosecution witness Daniel Pool sexually
molested them when they were children between the ages
of four and 11. In his motion, defendant asserted:
"Under Penal Code Section 1181(8), this testimony would
be both material and tend to cast doubt on the
testimony of the two victims in this case, as well as
the testimony of Mr. Pool." At the hearing on
defendant's motion, the parties submitted on the

_____

[5] The only statement of this claim in the FAP is as follows:
   C. Ground 3:
An important question of federal constitutional and state law
is raised by the issue whether the court errs in denying a
motion for a new trial after newly discovered evidence revealed
that the principal prosecution witness was a serial child abuser,
which in turn would have explained how the two victims were able
to provide detailed accounts of the acts of sexual abuse.  (FAP 8.)

briefing. The trial court denied the motion, finding the evidence insufficient to warrant a new trial. Defendant now claims the trial court abused its discretion in denying his motion for a new trial because there was a reasonable probability of a more favorable result. Defendant claims that the victims in this case had severe credibility problems and that the only circumstance that supported their credibility was their ability to describe defendant's sexual acts in explicit detail. Thus, defendant argues the new evidence was relevant to show that the victims learned about sex acts from someone else and thereby provide an alternative explanation for the one circumstance that made their testimony against him convincing. Defendant emphasizes, however, that he is not offering Pool as a third party culprit, asserting: "The evidence of Pool's pedophilia was relevant, not to show that Pool was the culprit in the charged crimes, but rather to show that the two girls had obtained their sophisticated knowledge of sex from Pool, the resident pedophile, which enabled them to convincingly concoct their accusation against [defendant]."

In short, defendant appears to be arguing that evidence Pool molested two girls in the past would be relevant and admissible to discredit the victims' testimony in this case that they were sexually abused by defendant. We find defendant's argument unpersuasive and find no abuse of discretion in the trial court's denial of his new trial motion.

A new trial may be granted "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. (8).) We review the trial court's denial of a motion for a new trial for an abuse of discretion. *(People v. Delgado* (1993) 5 Cal.4th 312, 328.) Newly discovered evidence must be material, noncumulative, and must contradict the strongest evidence introduced at trial against the defendant. (*Id.* at p. 329.) To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial. (*People v. Beeler* (1995) 9 Cal.4th 953, 1004-1005; *People v. Delgado, supra*, 5 Cal.4th at pp. 328-329.)

The proferred evidence does not meet this standard. The strongest evidence at trial was the victims' firsthand accounts of defendant's sexual abuse. The declarations defendant offered in support of his new trial motion contain nothing which contradicts or impeaches the victims' testimony. To the extent the declarations were offered as impeachment evidence, the evidence went to Pool's credibility only. (See *People v. Massey* (1987) 192 Cal.App.3d 819, 823 ["It is well established that

23

child molesting in California law is a crime of moral turpitude for impeachment and other purposes"].) The circumstance that Pool might have molested two little girls decades earlier did not make it more or less likely that the victims here were telling the truth when they testified that defendant molested them in 2003.

Defendant recognizes that, as a general rule, "evidence which merely impeaches a witness is not significant enough to make a different result probable...." (*People v. Huskins* (1966) 245 Cal.App.2d 859, 862 (*Huskins*.) However, he points to *Huskins*, a case in which impeachment of the main prosecution witness was considered sufficient to warrant a new trial. In *Huskins*, the Second District Court of Appeal reversed the trial court's denial of a motion for a new trial based on newly discovered evidence. *Huskins* involved a child molestation case in which it was discovered that the chief prosecution witness, the victim's foster mother, Mrs. White, had accused her own husband in civil commitment proceedings of being a sex pervert who had attacked his daughter and had sex with animals.FN6 In ruling that it was error for the trial court to deny the motion for a new trial, the Court of Appeal portrayed the new evidence as doing "more than merely impeach the main prosecution witness-it tends to destroy her testimony by raising grave doubts about her veracity and credibility ." (*Id.* at pp. 862-863.) This case is distinguishable. Pool was not the main prosecution witness. The main prosecution witnesses here were the victims themselves. The new evidence presented by defendant, while potentially impeaching Pool, had no bearing on the victims' credibility in this case.

>    FN6. These were unproved accusations.
>    (*Huskins, supra*, 245 Cal.App.2d at p. 861.)

We are also unconvinced by defendant's theory that evidence of Pool's asserted propensity to sexually abuse young girls would be relevant to show that the victims obtained their knowledge of sex from being molested by Pool. *People v. Daggett* (1990) 225 Cal.App.3d 751 (*Daggett*), on which defendant relies, is distinguishable. In that case, the defendant brought a motion under section 782, seeking to introduce evidence that the alleged victim had been molested at an earlier time by two older children and had in turn been charged with molesting two children. (*Daggett, supra*, 225 Cal.App.3d at p. 754.) The trial court found the defense offer of proof insufficient to hold a hearing on the prior victimization, although it allowed the victim to be questioned about his own offenses of molesting children. (*Ibid.*) At trial, the victim

described the defendant's alleged acts of touching, sodomy, and oral copulation. (*Ibid.*)

The appellate court concluded that the court erred in failing to hold a hearing to determine whether the acts committed previously against the victim were sufficiently similar to the acts alleged against the defendant. (*Daggett, supra*, 225 Cal.App.3d at p. 757.) The court stated, "[a] child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts. This is because knowledge of such acts may be unexpected in a child who had not been subjected to them. In such a case it is relevant for the defendant to show that the complaining witness had been subjected to similar acts by others in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant. Thus, if the acts involved in the prior molestation are similar to the acts of which the defendant stands accused, evidence of the prior molestation is relevant to the credibility of the complaining witness and should be admitted." (*Ibid.*)

Here, the prior acts of molestation by Pool did not involve the victims in this case, and thus Daggett does not appear to be direct authority for defendant's argument that the new evidence was admissible to show the victims acquired their knowledge of sex acts from him. Moreover, the acts described by Pool's alleged victims, while undeniably disturbing, were not as egregious as those attributed to defendant by the victims in this case.FN7 However, even assuming the new evidence bolstered R.'s claim that Pool molested her, it does not necessarily follow that defendant did not molest her. She claimed she was molested by both men. Moreover, there is no evidence that R. told D. about her alleged prior experiences with Pool. Defendant's theory that R. confided to D. what she learned from being molested by Pool, and that they then used that knowledge to fabricate charges against defendant is speculative and unsupported by the record or the evidence offered in support of the new trial motion.

> FN7. The sexual acts described by Pool's alleged victims included "touching to [the] victim's private parts" and "rubbing his penis on [the victim's] butt and ... vagina" but no actual intercourse as defendant's victim's described. According to one of the victims, Pool told her that when she grew hair, "he would give it all to [her]." Defendant suggests a similarity between this language and the colloquial expressions used by the victims in this case to describe

25

defendants' sexual acts to law enforcement
officials and interviewers.

We are also unconvinced by defendant's assertion that
evidence of Pool's prior molestations would be
admissible under Evidence Code section 1108. Evidence
Code section 1108, subdivision (a) provides: "In a
criminal action in which the defendant is accused of a
sexual offense, evidence of the defendant's commission
of another sexual offense or offenses is not made
inadmissible by Section 1101, if the evidence is not
inadmissible pursuant to Section 352." (Emphasis
added.)

Defendant acknowledges that Evidence Code section 1108
applies by its terms to "the defendant," but claims the
California Supreme Court had impliedly recognized that
Evidence Code section 1108 "would allow admission of a
third party's prior sex crime." *People v. Abilez* (2007)
41 Cal.4th 472 (*Abilez*), on which defendant relies,
does not support this assertion. Unlike Pool, the
so-called third party in Abilez was a codefendant and
he and the defendant were both charged with the same
sexual offense-forcible sodomy-but the codefendant was
acquitted and the defendant was convicted of the crime.
(*Abilez, supra*, 41 Cal.4th at pp. 472, 485.) At trial,
the defendant offered his codefendant's adjudication of
a prior sex crime as evidence of identity; i.e., to
show that it was the codefendant who sodomized and
killed the victim. (*Id.* at p. 502.) The Supreme Court
concluded that the trial court did not abuse its
discretion under Evidence Code sections 1101 and 1108
by excluding the prior crime because it was remote and
dissimilar to the charged crime. (*Abilez, supra*, 41
Cal.4th at pp. 502-504.) It also rejected the
defendant's "subsidiary claim that the trial court
erred in excluding the evidence because it comprised
evidence of third party culpability." (*Abilez, supra*,
41 Cal.4th at p. 502; italics added.) *Abilez* simply
does not support defendant's position that the evidence
of a non-defendant, third party's prior molestations
would be admissible under Evidence Code section 1108.

For all these reasons, we conclude that defendant has
not shown the trial court abused its discretion in
denying his motion for a new trial based on newly
discovered evidence.

(LD 20-1, 22-26.)

        B.   Analysis

    As Respondent notes, Petitioner's claim is based on state

law.  The state court decision addressed the state court's

alleged error in the interpretation or application of Cal. Pen. Code § 1181(8), which included the application of state law cases concerning the nature of newly discovered evidence that would warrant the granting of a new trial pursuant to § 1181; the interpretation and application of Cal. Evid. Code §§ 1101, 1108, and 352; and the application of state cases that in turn interpreted and applied those statutes.

To the extent that Petitioner's claim rests on state law, Petitioner has not alleged facts that would entitle him to relief in this proceeding, which is limited to federal claims. Accordingly, it will be recommended that Petitioner's claim concerning the new trial motion be dismissed to the extent it is based on state law.

Petitioner appears to argue that the evidence was critical to the credibility of not only Pool, but also the victims, who were the chief prosecution witnesses. Thus, it was fundamentally unfair to exclude the evidence, or to uphold a determination of guilt without the evidence.

Although state and federal authorities have broad latitude to establish rules excluding evidence from criminal trials, the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment guarantee a criminal defendant a meaningful opportunity to present a complete defense. Crane v. Kentucky, 476 U.S. 683, 690 (1986). Due process provides a defendant the right to present a defense by compelling the attendance and presenting the testimony of witnesses. Washington v. Texas, 388 U.S. 14, 18-19, 23 (1967). However, a defendant does not have an absolute right to

present evidence without reference to its significance or source; the evidence must be relevant, material, and vital to the defense. Id. at 16. Further, the exclusion of the evidence must be arbitrary or disproportionate to the purposes the exclusionary rule is designed to serve. Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006). If the mechanical application of a rule that is respected, frequently applied, and otherwise constitutional would defeat the ends of justice, then the rule must yield to those ends. Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

However, well established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Holmes v. South Carolina, 547 U.S. at 326. Thus, it is constitutionally permissible to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues. Holmes v. South Carolina, 547 U.S. at 326-27.

Where exclusion of evidence violates a petitioner's right to present a defense, habeas relief is the appropriate remedy only if the constitutional violation resulted in error that was not harmless, that is, error that resulted in actual prejudice, or had a substantial and injurious effect or influence in determining the jury's verdict. Jackson v. Nevada, 688 F.3d 1091, 1104-05 (9th Cir. 2012), pet. cert. filed 81 U.S.L.W. 3349 (Dec. 3, 2012) (No. 12-694) (citing Fry v. Pliler, 551 U.S. 112, 121-22 (2007) and Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). In determining whether the Brecht standard has been

met, a court considers various factors, including 1) the importance of the witness's testimony in the prosecution's case, 2) whether the testimony was cumulative, 3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, 4) the extent of cross-examination otherwise permitted; and 5) the overall strength of the prosecution's case.  Merolillo v. Yates, 663 F.3d 444, 455 (9th Cir. 2011) (citing Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

Here, although the state court did not articulate a federal standard of decision, its analysis was not inconsistent with federal due process standards.  The state court considered the relevance, materiality, and importance of the evidence and correctly concluded it was the victims', not Pool's, testimony that was the critical evidence against Petitioner.  Pool's testimony was essentially corroborative of D's testimony concerning her conversation with Pool about Petitioner's having brought beer into her room and his having molested her, and the subsequent report to law enforcement.

It is true that in August 2004, about eight months after her placement in foster care, R claimed that Pool had also molested her and that she had tried to tell her teachers, who had not believed her.  However, no details were given.  D denied that Pool had molested her, and neither girl reported molestation by Pool or others in interviews with law enforcement.  Thus, the jury already had before it evidence from R that Pool had molested her.  Further, the testifying detective indicated that nine months after he investigated the allegations concerning

1  Petitioner, one of the victims reported that Pool had also been
2  molesting her.  (VIII RT 2218.)

3      The new evidence consisted of Pool's behavior with third
4  parties decades before.  The state court properly concluded that
5  evidence that Pool molested two little girls decades earlier did
6  not tend to show the truthfulness or untruthfulness of the
7  present victims' testimony, but instead went to Pool's
8  credibility because it showed that at some time he had committed
9  an act of moral turpitude.  (Doc. 20-1, 23-24.)

10     The state court further acknowledged that a child's
11  testimony in a molestation case can be deemed credible by the
12  accurate description of the sexual acts because knowledge of such
13  acts may be unexpected in a child who has not otherwise been
14  subjected to them.  The state court noted that showing that the
15  complaining witness or witnesses had been subjected to similar
16  acts by others could cast doubt upon the conclusion that the
17  child must have learned of the acts through the conduct of the
18  defendant.  However, the state court reasoned that because the
19  prior acts of molestation by Pool did not involve the victims in
20  the present case, they did not provide the required inference of
21  knowledge on the part of the victims.  The state court noted that
22  Pool's alleged prior molestations involved touching and rubbing,
23  but no actual intercourse.  Thus, they were not as egregious as
24  those attributed to Petitioner by the victims, and were of a
25  character that would not have provided the knowledge of sexual
26  acts exhibited by the victims on the stand.  (Id. at 23-25.)

27     The state court properly concluded that even though evidence
28  of Pool's prior acts with third parties might indirectly bolster

R's claim that Pool molested her, it did not necessarily

establish that Petitioner did not molest her, and it did not bear

sufficiently upon D's testimony because there was no evidence

that R told D about the former's alleged prior experiences with

Pool.  The state court reasonably concluded that the theory that

R confided to D what she had learned from being molested by Pool

and then used that knowledge to fabricate charges against

Petitioner was based on speculation and was unsupported by the

record or the evidence offered in support of the new trial

motion.  (<u>Id.</u> at 25.)  Thus, the exclusion of the evidence

advanced goals related to the administration of justice.

A fairminded jurist could conclude that the state court

considered the relevant factors and reasonably determined that

the proffered evidence was not significantly impeaching of the

victims' critical evidence, and that its minimal probative value

with respect to Pool's credibility was outweighed by an undue

risk of unfair prejudice, confusion of the issues, or potential

to mislead the jury.  It thus appears that the state court

reasonably concluded that a determination of guilt without the

proffered testimony was not arbitrary or disproportionate.

Accordingly, the state court's decision denying the motion

for new trial was not contrary to, or an unreasonable application

of, clearly established federal law.  Therefore, it will be

recommended that Petitioner's claim concerning denial of the new

trial motion be denied.

XI.  <u>Brady Violation</u>

For the first time in his traverse, Petitioner sets forth

facts concerning the post-trial[6] discovery of information that
Pool had been investigated for sexual molestation of the younger
of the two alleged victims in January 2004, and that two victims
of Pool's molestation came forward after trial.  (Doc. 24, 9-10.)
Petitioner argues that the prosecution's failure to disclose
before trial that Pool had been investigated by the sheriff for
molestation of one of the victims constituted a <u>Brady</u>[7] violation
that deprived Petitioner of his right to due process of law.

However, Petitioner did not allege these facts or a
violation of <u>Brady</u> in the petition.  A court construes a pro se
litigant's habeas petition with deference.  <u>Maleng v. Cook</u>, 490
U.S. 488, 493 (1989); <u>Belgarde v. State of Montana</u>, 123 F.3d
1210, 1213 (9th Cir. 1997).  However, Petitioner's claim that the
trial court erred in denying a motion for a new trial made under
California law concerning new evidence is not tantamount to
raising a <u>Brady</u> violation.

Further, the Respondent has not had an opportunity to
respond to a <u>Brady</u> claim.  In answering the petition, Respondent
alleged that any claims not properly presented in state court
under state rules were barred as procedurally defaulted;
Petitioner was also required to show exhaustion of any claims
other than those discussed by Respondent in the answer.  (Doc.
20, 6.)  The Court notes that Petitioner's <u>Brady</u> claim does not
appear to have been raised in Petitioner's petition for review

---

[6] The Court notes that Pool testified at trial that he was aware that
before the children had moved into his home, R had accused him of touching her
inappropriately; the allegations were investigated, but Pool was never charged
with any crimes.  (Doc. 20-1, 6.)

[7] The reference is to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

filed in the California Supreme Court.  (LD 5.)  Petitioner has

not shown that he has exhausted state court remedies as to such a

claim.[8]

Accordingly, it will be recommended that the Court exercise

its discretion to decline to consider Petitioner's <u>Brady</u> claim.

XII.  <u>Sufficiency of the Evidence of an Attempt</u>

Petitioner argues that the issue whether there is sufficient

evidence of an attempt where the evidence showed only completed

crimes, and the prosecutor elected not to use the completed

crimes to support the charged attempt, raises an important

question of federal constitutional and state law.  (FAP 8.)

A.  <u>The State Court's Decision</u>

The appellate opinion of the CCA was the last reasoned

decision on this claim.  The state court's opinion with respect

to this issue is as follows:

III. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence to
support his conviction for attempted lewd acts against
D. in count 4. Defendant's argument is somewhat
confusing because he acknowledges the record contains
sufficient evidence to support the charge. Even though
D. described only completed acts of rape in her
testimony, defendant recognizes that section 663 FN2
allows for a defendant to be charged and convicted of
an attempted crime, even if the evidence shows a
completed crime. However, it is defendant's position
that the prosecutor did not intend for count 4 to refer
to any of the completed acts shown on the record, and
therefore the principle embodied in section 633 is
inapplicable here. Defendant further claims that the

---

[8] Although non-exhaustion of remedies has been viewed as an affirmative
defense, it is the petitioner's burden to prove that state judicial remedies
were properly exhausted.  28 U.S.C. § 2254(b)(1)(A); <u>Darr v. Burford</u>, 339 U.S.
200, 218-19 (1950), <u>overruled in part on other grounds in</u> <u>Fay v. Noia</u>, 372
U.S. 391 (1963); <u>Cartwright v. Cupp</u>, 650 F.2d 1103, 1104 (9th Cir. 1981).  If
available state court remedies have not been exhausted as to all claims, a
district court must dismiss a petition.  <u>Rose v. Lundy</u>, 455 U.S. 509, 515-16
(1982).

prosecutor essentially conceded there was no evidence to support count 4, but the trial court improperly saved the count by tying it to one of the completed crimes. We find defendant's argument unpersuasive, and conclude there was sufficient evidence to support count 4.

> FN2. Section 663 provides: "Any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was perpetrated by such person in pursuance of such attempt, unless the court, in its discretion, discharges the jury and directs such person to be tried for such crime."

In the amended information, count 4 alleged that defendant "did, on or about December 24, 2003 ... commit a FELONY, namely, violation of Section 664/288(a) ... in that the said defendant did willfully, unlawfully, and lewdly attempted to commit a lewd and lascivious act upon ... [D.], a child under the age of fourteen years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant and the said child."

Here, there was evidence that during the third incident D. described in her testimony, defendant gave her a beer to drink and then put his penis inside her vagina. It was after this incident that D. reported defendant's conduct to Pool. Although D. thought the third incident occurred around Thanksgiving, it was Pool's recollection that it occurred around Christmas Eve, and both witnesses referred to the circumstance that Pool was preparing a turkey for the holiday meal. Defendant does not dispute, and we find, D.'s testimony describing a rape was more than sufficient to support defendant's conviction of attempted lewd acts as charged in count 4.

Defendant nonetheless maintains that the prosecutor intended for count 4 to refer to an entirely different incident for which there was no evidence. We note that defendant's interpretation of the prosecutor's intent is based primarily on brief comments she made in response to the defense's section 1118.1 motion at the end of the prosecution's case-in-chief. The prosecutor expressed that she would be willing to dismiss count 4 because "That count the girls did not testify-they testified to only completed acts." However, the trial court declined to dismiss count 4, explaining:

> "The fact that it testified as to a completed act doesn't in any way impact lesser

included. I mean, the attempt. In fact, the
defendant's given a break that it was called
an attempt as opposed to completed act. I
mean the People could, of course, amend to
conform to proof and then we'd have to re-do
a bunch of the jury instructions, which we
can do, you know. But the evidence is more
than sufficient."

Thus, the court correctly noted that evidence of a
completed rape was sufficient to sustain the charge of
attempted lewd acts. Defendant suggests the
prosecutor's failure to "accept the court's invitation
to move to conform to proof" is somehow an indication
that the prosecutor was conceding that the evidence was
insufficient to support count 4. However, the court
clearly discouraged the prosecutor from taking this
course of action by pointing out that the jury
instructions would have to be redone and that the
evidence was sufficient to support the count as charged
in any event.

Nor do we find any special significance in the fact the
prosecutor did not specifically ask the jury to return
a guilty verdict on count 4 during closing argument.
This does not necessarily constitute a concession that
the evidence was insufficient to prove the crime of
attempted lewd acts as defendant suggests. It is
apparent from the record that the prosecutor was aware
she had only presented evidence of three incidents of
sexual abuse against D., not four as charged.FN3 It is
reasonable to suppose she was hoping the jury would
find those incidents supported the more serious
offenses of aggravated sexual assault charged in the
first three counts. However, this is not what happened.
The jury acquitted defendant on the third count of
aggravated sexual assault, and found defendant guilty
of the first two counts of aggravated sexual assault
and the fourth count of attempted lewd acts based on
the three incidents described by D. in her testimony.
The jury was properly instructed on the elements of the
attempted lewd acts offense, and defendant does not
dispute that her testimony was sufficient to support
his conviction on that count. Accordingly, we reject
his sufficiency of the evidence challenge which is
based, not on the state of the evidence, but on the
prosecutor's alleged state of mind.

    FN3. Although defendant refers to what he
    describes as D.'s generic testimony that
    defendant forced her to have sexual
    intercourse 30 or 35 times, this was not
    evidence that was presented by or relied on
    by the prosecution but rather consisted of
    statements elicited by the defense during

35

1    cross-examination.

2   (Doc. 20-1, 17-19.)

3        B.   Analysis

4        To determine whether a conviction violates the

5   constitutional guarantees of due process of law because of

6   insufficient evidence, a federal court ruling on a petition for

7   writ of habeas corpus must determine whether any rational trier

8   of fact could have found the essential elements of the crime

9   beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,

10  319, 20-21 (1979); Windham v. Merkle, 163 F.3d 1092, 1101 (9th

11  Cir. 1998); Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

12       All evidence must be considered in the light most favorable

13  to the prosecution. Jackson, 443 U.S. at 319; Jones, 114 F.3d at

14  1008. It is the trier of fact's responsibility to resolve

15  conflicting testimony, weigh evidence, and draw reasonable

16  inferences from the facts; thus, it must be assumed that the

17  trier resolved all conflicts in a manner that supports the

18  verdict. Jackson v. Virginia, 443 U.S. at 319; Jones, 114 F.3d

19  at 1008. The relevant inquiry is not whether the evidence

20  excludes every hypothesis except guilt, but rather whether the

21  jury could reasonably arrive at its verdict. United States v.

22  Mares, 940 F.2d 455, 458 (9th Cir. 1991). Circumstantial

23  evidence and the inferences reasonably drawn therefrom can be

24  sufficient to prove any fact and to sustain a conviction,

25  although mere suspicion or speculation does not rise to the level

26  of sufficient evidence. United States v. Lennick, 18 F.3d 814,

27  820 (9th Cir. 1994); United States v. Stauffer, 922 F.2d 508, 514

28  (9th Cir. 1990); see, Jones v. Wood, 207 F.3d at 563. The court

1  must base its determination of the sufficiency of the evidence
2  from a review of the record.  Jackson at 324.

3      The Jackson standard must be applied with reference to the
4  substantive elements of the criminal offense as defined by state
5  law.  Jackson, 443 U.S. at 324 n.16; Windham, 163 F.3d at 1101.
6  However, the minimum amount of evidence that the Due Process
7  Clause requires to prove an offense is purely a matter of federal
8  law.  Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2064 (2012)
9  (per curiam).  For example, under Jackson, juries have broad
10 discretion to decide what inferences to draw and are required
11 only to draw reasonable inferences from basic facts to ultimate
12 facts.  Id.

13     Further, under the AEDPA, federal courts must apply the
14 standards of Jackson with an additional layer of deference.
15 Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2062 (2012); Juan
16 H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  The question
17 is, therefore, whether the state court decision being reviewed
18 reflected an objectively unreasonable application of the Jackson
19 standards to the facts of the case.  Coleman v. Johnson, 132
20 S.Ct. at 2062; Juan H. v. Allen, 408 F.3d at 1275.  The
21 determination of the state court on a question of sufficiency of
22 the evidence is entitled to considerable deference under 28
23 U.S.C. § 2254(d).  Coleman v. Johnson, 132 S.Ct. at 2065.

24     Here, the state court did not articulate its standard of
25 review.  However, it reviewed the elements of the charge, namely,
26 an unlawful attempt to commit a lewd and lascivious act upon a
27 child under the age of fourteen years with the intent of
28 arousing, appealing to, and gratifying the lust, passions, and

sexual desires of the defendant and the child.  (Doc. 20-1, 17.)
The state court reviewed the evidence of the third incident
described by D in which Petitioner gave her a beer and put his
penis in her vagina, which was followed by D's report of the
conduct to Pool when Pool was preparing a turkey for a holiday
meal.  (Id. at 18.)  The court concluded that D's testimony
regarding the rape was more than sufficient to show an attempt to
commit a lewd act upon the child with the intent of gratifying
the defendant's passions.  (Id.)

Further, the CCA noted that Petitioner's failure to dispute
D's testimony was sufficient to support the conviction.  (Id.)
The court reviewed the arguments to the jury and the verdicts,
noting that the jury apparently acquitted Petitioner on the third
count of aggravated assault against D and instead found two
completed aggravated sexual assaults and one count of an
attempted lewd act.  The court dismissed Petitioner's assertion
that the prosecutor's offer during argument on a motion pursuant
to Cal. Pen. Code § 1118.1[9] to withdraw the attempt count had to
be accepted.  The state court rejected Petitioner's challenge to
sufficiency of the evidence as it was not based on the evidence,
but rather on the prosecutor's alleged state of mind.  (Id.)

A fairminded jurist could conclude that the state court's
application of the rule of Jackson v. Virginia was based on
reasonable inferences drawn from evidence in the record, and that

---

[9] Cal. Pen. Code § 1118.1 provides that at the close of the evidence in
a jury trial and before submission to the jury, and upon the motion of the
court or the defendant, a judgment of acquittal shall be entered if the
evidence before the court is insufficient to sustain a conviction of the
offense on appeal.

1  it thus was not objectively unreasonable.

2      Because Petitioner has failed to show that the CCA's opinion

3  on the sufficiency of the evidence resulted in a decision that

4  was contrary to, or an unreasonable application of clearly

5  established federal law, it will be recommended that Petitioner's

6  sufficiency of the evidence claim be denied.

7      XIII.  <u>Evidentiary Hearing</u>

8      Petitioner seeks an evidentiary hearing to review factual

9  disputes and to appoint counsel for such a hearing.  (Doc. 24,

10  4.)

11      The decision to grant an evidentiary hearing is generally

12  left to the sound discretion of the district courts.  28 U.S.C. §

13  2254; Habeas Rule 8(a); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473

14  (2007).  To obtain an evidentiary hearing in federal court under

15  the AEDPA, a petitioner must allege a colorable claim by alleging

16  disputed facts which, if proved, would entitle him to relief.

17  <u>Schriro v. Landrigan</u>, 550 U.S. at 474.

18      The determination of entitlement to relief, in turn, is

19  limited by 28 U.S.C. § 2254(d)(1), which requires that to obtain

20  relief with respect to a claim adjudicated on the merits in state

21  court, the decision must be either contrary to, or an

22  unreasonable application of, clearly established federal law.

23  <u>Schriro v. Landrigan</u>, 550 U.S. at 474.  Further, in analyzing a

24  claim pursuant to § 2254(d)(1), a federal court is limited to the

25  record before the state court.  <u>Cullen v. Pinholster</u>, 131 S.Ct.

26  1388, 1398 (2011).  Thus, when a state court record precludes

27  habeas relief under the limitations set forth in § 2254(d), a

28  district court is not required to hold an evidentiary hearing.

1  <u>Cullen v. Pinholster</u>, 131 S.Ct. at 1399 (citing <u>Schriro v.</u>

2  <u>Landrigan</u>, 550 U.S. at 474).  An evidentiary hearing may be

3  granted with respect to a claim adjudicated on the merits in

4  state court where the petitioner satisfies § 2254(d)(1), or where

5  § 2254(d)(1) does not apply, such as where the claim was not

6  adjudicated on the merits in state court.  <u>Cullen v. Pinholster</u>,

7  131 S.Ct. at 1398, 1400-01.

8       Here, the state court adjudicated Petitioner's claims on the

9  merits.  Petitioner has not shown that the state court decision

10 was contrary to, or an unreasonable application of, clearly

11 established federal law within the meaning of § 2254(d)(1).

12 Further, Petitioner has not shown or attempted to show that the

13 state court adjudication of his claims resulted in a decision

14 that was based on an unreasonable determination of the facts in

15 light of the evidence presented in the state court proceedings.

16 Thus, this court's review is limited to the record before the

17 state court, and Petitioner's request for an evidentiary should

18 be denied.

19      Accordingly, it will be recommended that Petitioner's

20 request for an evidentiary hearing be denied.

21      XIV.  <u>Certificate of Appealability</u>

22      Unless a circuit justice or judge issues a certificate of

23 appealability, an appeal may not be taken to the Court of Appeals

24 from the final order in a habeas proceeding in which the

25 detention complained of arises out of process issued by a state

26 court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537

27 U.S. 322, 336 (2003).  A certificate of appealability may issue

28 only if the applicant makes a substantial showing of the denial

of a constitutional right.  § 2253(c)(2).  Under this standard, a
petitioner must show that reasonable jurists could debate whether
the petition should have been resolved in a different manner or
that the issues presented were adequate to deserve encouragement
to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336
(quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).

A certificate should issue if the Petitioner shows that
reasonable jurists would find it debatable whether: 1) the
petition states a valid claim of the denial of a constitutional
right or 2) the district court was correct in any procedural
ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of
the claims in the habeas petition, generally assesses their
merits, and determines whether the resolution was debatable among
jurists of reason or wrong.  Id.  It is necessary for an
applicant to show more than an absence of frivolity or the
existence of mere good faith, although the applicant need not
show that the appeal will succeed.  Miller-El v. Cockrell, 537
U.S. at 338.

A district court must issue or deny a certificate of
appealability when it enters a final order adverse to the
applicant.  Habeas Rule 11(a).

Here, it does not appear that reasonable jurists could
debate whether the petition should have been resolved in a
different manner.  Petitioner has not made a substantial showing
of the denial of a constitutional right.  Accordingly, it will be
recommended that the Court decline to issue a certificate of
appealability.

1    XV.   Recommendations

2        Accordingly, it is RECOMMENDED that:

3        1) The Court DECLINE to consider the new claims that are

4    raised by Petitioner in the traverse; and

5        2) The first amended petition for writ of habeas corpus be

6    DENIED; and

7        3)  Petitioner's request for an evidentiary hearing be

8    DENIED; and

9        4)  Judgment be ENTERED for Respondent; and

10       5)  The Court DECLINE to issue a certificate of

11   appealability.

12       These findings and recommendations are submitted to the

13   United States District Court Judge assigned to the case, pursuant

14   to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of

15   the Local Rules of Practice for the United States District Court,

16   Eastern District of California.  Within thirty (30) days after

17   being served with a copy, any party may file written objections

18   with the Court and serve a copy on all parties.  Such a document

19   should be captioned "Objections to Magistrate Judge's Findings

20   and Recommendations."  Replies to the objections shall be served

21   and filed within fourteen (14) days (plus three (3) days if

22   served by mail) after service of the objections.  The Court will

23   then review the Magistrate Judge's ruling pursuant to 28 U.S.C.

24   § 636 (b)(1)(C).  The parties are advised that failure to file

25   objections within the specified time may waive the right to

26   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d

27   ///

28   ///

1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:   January 22, 2013**            /s/ Sheila K. Oberto
                                  UNITED STATES MAGISTRATE JUDGE